13 CV 1703

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE FURMAN

CITIGROUP GLOBAL MARKETS INC.,

Plaintiff,

v.

NORTH CAROLINA EASTERN MUNICIPAL
POWER AGENCY,

Defendant.

Case No. _____



## COMPLAINT

Plaintiff Citigroup Global Markets Inc. ("Citigroup"), by and through its undersigned attorneys, hereby alleges as follows for its complaint against defendant North Carolina Eastern Municipal Power Agency (the "Power Agency"):

## NATURE OF ACTION

1.      This is an action to enjoin an arbitration that the North Carolina Eastern Municipal Power Agency initiated against Citigroup before the Financial Industry Regulatory Authority ("FINRA") on December 21, 2012, captioned *North Carolina Eastern Municipal Power Agency* v. *Citigroup Global Markets, Inc.*, FINRA No. 13-00004.  The claims brought by the Power Agency against Citigroup in the FINRA Arbitration are contained in its Statement of Claim filed with FINRA on December 21, 2012.  The Statement of Claim in the arbitration is attached hereto as Exhibit A.

2.      In the arbitration, the Power Agency seeks to recover damages that it claims to have suffered as a result of its issuance of auction rate securities in May 2004.

Auction rate securities are financing mechanisms that pay interest or dividends at rates set at periodic auctions. The Power Agency's purported damages stem from its allegations that Citigroup, in connection with underwriting its 2004 auction rate securities issuance, failed to disclose material information regarding the auction rate securities market (*see* St. Cl. ¶¶ 2-3, 32-37).[1] The Power Agency alleges that if it had known the facts that Plaintiff purportedly failed to disclose, it "would never have chosen to issue [auction rate securities]" (St. Cl. ¶ 36).

3.      The Power Agency invokes FINRA Rule 12200 as the basis for arbitration of its claims against Citigroup. Rule 12200 states that FINRA members and their "customers" must arbitrate a dispute if the customer requests it, and the dispute arises in connection with the member's business activities. The Power Agency's claims are legally and factually defective, and time-barred. In court, those claims would be disposed of summarily at the outset, prior to any discovery; that is not necessarily the case in arbitration. FINRA rules do not generally permit motions to dismiss until after the parties engage in discovery and claimant puts on its case-in-chief.

4.      FINRA arbitration is an improper forum for the Power Agency to bring its claims against Citigroup. Pursuant to the Broker-Dealer Agreement executed by and between Deutsche Bank Trust Company Americas (as auction agent), Citigroup (as broker-dealer), and the Power Agency (as borrower), the parties agreed to bring "all actions and proceedings" arising out that agreement, or any transactions contemplated

---

[1]      Citations in the form of "St. Cl. ¶ __" are to paragraphs in the Statement of Claim.

thereby, in "the United States District Court in the County of New York" (*see* Ex. B at 13).  Particularly, because the Power Agency purports to ground FINRA's jurisdiction on Citigroup's broker-dealing activities, it was required to assert its claims federal court in Manhattan.

5.      This Court therefore should declare that the dispute is not arbitrable and enjoin the FINRA Arbitration.

## THE PARTIES

6.      Plaintiff Citigroup Global Markets Inc. is a New York corporation with its principal place of business in New York, New York.

7.      Defendant North Carolina Eastern Municipal Power Agency is, upon information and belief, a public body and body corporate and politic organized under Chapter 159B of the General Statutes of North Carolina.   The Power Agency is comprised of 32 cities and towns in eastern North Carolina and provides bulk power service to its 32 members.

## JURISDICTION & VENUE

8.      This is an action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 *et seq.* and Federal Rule of Civil Procedure 57, and for injunctive relief pursuant to Federal Rule of Civil Procedure 65(a).

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claims at issue in the FINRA Arbitration present a federal question. Citigroup's request for an injunction and declaratory judgment necessarily presents questions of federal law because the Power Agency's claims in the FINRA arbitration

include claims under Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 promulgated thereunder.

10.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  Specifically, the FINRA arbitration seeks damages allegedly incurred by the Power Agency in the "millions of dollars" (St. Cl. ¶ 68). Moreover, Citigroup anticipates that it will incur attorneys' fees in excess of $75,000 if it must defend its claims in the FINRA arbitration.

11.    This Court has personal jurisdiction over the Power Agency because the Power Agency contractually consented to the Court's jurisdiction in its Broker-Dealer Agreement with Citigroup (*see* Ex. B at 13).   Additionally, this Court has personal jurisdiction over the Power Agency because this action arises out of activities undertaken by the Power Agency within this District in connection with its issuance of the auction rate securities and the claims at issue in the FINRA arbitration.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to this action occurred within this judicial district.   Further, venue is proper because the Power Agency contractually consented to the venue of this judicial district in its Broker-Dealer Agreement with Citigroup (*see* Ex. B at 13).

## **FACTUAL BACKGROUND**

### **The 2004 Bond Issuance**

13.    In May 2004, the Power Agency elected to issue $222,975,000 in auction

rate securities in order to refinance a portion of its outstanding debt.

14.    Auction rate securities are a financing mechanism that pay interest or dividends at rates set at periodic auctions.  Investors place bids at the auctions, and the lowest rate at which there are sufficient bids to purchase all of the securities offered for sale at auction is the "clearing rate," or the rate at which the securities will earn interest until the next auction.  If there are not enough bids to purchase all of the securities offered for sale, the auction fails, and the securities earn interest until the next auction pursuant to a predetermined "maximum rate" set forth in the bonds' offering documents.

15.    Issuers of auction rate securities contract with financial institutions to serve as broker-dealers for the securities following their issuance.  These broker-dealers are authorized to accept purchase or sell orders from current or prospective investors in the auction rate securities.  The broker-dealers then submit these orders to the auction agent which, in turn, calculates the interest or dividend rate until the next auction.

16.    Citigroup served as the sole underwriter for the Power Agency's 2004 issuance.  On May 27, 2004, Citigroup entered into a bond purchase contract with the Power Agency, pursuant to which Citigroup purchased certain subseries of the Power Agency's auction rate securities to sell them to the public (the "Underwriting Agreement").  Upon information and belief, the Power Agency was advised by its independent, experienced legal counsel, Hawkins Delafield & Wood LLP, throughout the negotiation and execution of the Underwriting Agreement.  The Underwriting Agreement did not provide any right to arbitrate disputes arising out of the agreement.

17.    Citigroup and the Power Agency further agreed that Citigroup would

serve as broker-dealer for the 2004 bonds (meaning Citigroup had the ability to enter purchase and sell orders at auctions on behalf of investors or potential investors in the Power Agency's auction rate securities). Those services were provided pursuant to a Broker-Dealer Agreement, dated June 1, 2004, between Deutsche Bank Trust Company Americas (as auction agent), Citigroup (as broker-dealer), and the Power Agency (the "Broker-Dealer Agreement").

18. The Broker-Dealer Agreement does not provide any right to arbitrate disputes arising out of the agreement. To the contrary, Citigroup and the Power Agency expressly agreed that that:

> [A]ll actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York and that, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such court

(Ex. B at 13).

19. The Broker-Dealer Agreement also contains a merger clause, which provides that "[t]his Broker-Dealer Agreement, and the other agreements and instruments executed and delivered in connection with the issuance of the auction rate securities, contain the entire agreement of the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements or understandings, oral, written or inferred between the parties relating to the subject matter hereof" (*id.* at 12).

20. The 2004 Broker-Dealer Agreement and Underwriting Agreement were negotiated simultaneously as part of the set of contracts that governed the Power

Agency's 2004 issuance of auction rate securities.  Both agreements were the result of arms-length negotiations between Citigroup, the Power Agency, and counsel for both parties.

**The Arbitration**

21.      In the period 2004-2007, the Power Agency enjoyed the desired low interest rates on its auction rate securities.  From 2004 through early February 2008, the interest rates on the Power Agency's securities ranged from very low, 0.95%, to well within the normal low range for that period, 4.5% (*see* Ex. C).  In connection with the worldwide financial crisis, however, the interest rates on the Power Agency's auction rate securities began to increase (*see* St. Cl. ¶¶ 2, 35).  The interest rates spiked briefly to highs between 7.45% and 11% in late February and early March 2008, but then dropped back to 5.11% by April 2008 and a low of 3.5% in May 2008 (*see* Ex. C).  Not until after all that, in late May 2008, did the Power Agency finally decide to refinance its auction rate securities—something it could have done much earlier and avoided the brief spike in interest rates experienced in February 2008.

22.      On or about December 21, 2012, the Power Agency filed a Statement of Claim with FINRA, thereby instituting arbitration proceedings against Citigroup.  All of the Power Agency's claims are time barred under the applicable statutes of limitation.  Further, the Power Agency's claims and theories are baseless, particularly in light of Citigroup's and its own disclosures regarding the nature and risks of the auction rate securities market.

23.      In the arbitration, the Power Agency alleges that, in connection with the

underwriting of its May 2004 bond issuance, "Citi recommended that [the Power Agency] structure its bonds as auction rate securities" (St. Cl. ¶ 28). It further alleges that "Citi did not disclose that at the time they had a practice of placing bids to prevent failures in every auction for which they were lead broker-dealer, or that without these support bids auctions would fail, the [auction rate securities] market would collapse, and lower interest costs surely would not be realized" (St. Cl. ¶ 32).

24.     The Power Agency further alleges that, if it had known that by issuing auction rate securities it would become "wholly-dependent on Citi's continued support bidding practice for the [auction rate securities] market to function and for [the Power Agency's auction rate securities] to generate the predicted short-term rates in its auctions, [it] would have issued its debt in an alternate structure" (St. Cl. ¶ 3; *see also* St. Cl. ¶ 74).

25.     The relief the Power Agency seeks in the arbitration includes actual, compensatory, punitive and consequential damages; restitution and disgorgement of all fees and costs associated with the 2004 bonds, including broker-dealer fees; and its fees and costs associated with the arbitration.

26.     Pursuant to the forum selection clause in the Broker-Dealer Agreement the Power Agency expressly agreed that any disputes arising out of its 2004 issuance of auction rate securities must be brought, if at all, in the United States District Court in the County of New York. Arbitration is plainly precluded.

27.     No panel has yet been appointed in the arbitration. The deadline for Citigroup to answer the Power Agency's Statement of Claim is March 13, 2013. Citigroup is filing its answer with FINRA to avoid a default judgment, and is objecting to

FINRA's jurisdiction over the dispute.

**Citigroup Will Suffer Irreparable Harm Without Injunctive Relief**

28.     Unless the Power Agency is enjoined from pursuing its claims in the FINRA Arbitration, Citigroup will suffer irreparable harm because: (i) it will be deprived of its right to the forum in which it and the Power Agency expressly agreed to resolve disputes arising out the Power Agency's 2004 issuance of auction rate securities; (ii) it will be forced to arbitrate a dispute it has not agreed to arbitrate; and (iii) it will be forced to expend substantial resources that can never be recovered in defending itself in the FINRA Arbitration, or risk an adverse outcome in those proceedings.

29.     Moreover, the Power Agency's claims in the arbitration are time-barred by the applicable statutes of limitations.  Unlike in court, however, Citigroup may not have the immediate ability to seek dismissal of the claims in FINRA, without incurring the expense of discovery and participating in a hearing on the merits.  Unless this Court grants the injunctive relief that Citigroup seeks, it will be forced to expend resources it can never recover arbitrating the Power Agency's claims and will thereby suffer irreparable harm.

**CAUSES OF ACTION**
**COUNT I**
**(For a declaratory judgment)**

30.     Citigroup repeats and realleges paragraphs 1 through 29 as though fully set forth herein.

31.     The parties contractually agreed to bring any dispute related to the Power Agency's 2004 issuance of auction rate securities exclusively in this Court.  Citigroup's

valid and binding agreement with the Power Agency supersedes any right that the Power Agency may have had to arbitrate under the FINRA Code of Arbitration Procedure.

32.     Arbitration is a creature of contract, and a FINRA arbitration panel has no authority to decide whether the parties have submitted their claims to it under the terms of their contract.  It is settled law that a court can determine the threshold question of whether parties have agreed to arbitrate.  This Court, not FINRA, determines the arbitrability of the Power Agency's claims.

33.     Citigroup and the Power Agency expressly agreed in the Broker-Dealer Agreement that this Court is the parties' exclusive designated forum.  Even if the Power Agency were a customer of Citigroup with respect to its "broker-dealing" activities,[2] based on the Power Agency's characterization of the dispute, the parties agreed to litigate the dispute in a federal court in New York County.

34.     Accordingly, the disputes between the Power Agency and Citigroup are not arbitrable.

35.     Declaratory relief from this Court will resolve these controversies and limit the uncertainties.

36.     As alleged herein, a real, substantial, and immediate controversy is presented regarding the rights, duties, and liabilities of the parties.  Citigroup, therefore, requests a declaratory judgment from this Court pursuant to 28 U.S.C. §§ 2201, *et seq.* and Federal Rule of Civil Procedure 57 that the Power Agency's claims are not arbitrable

---

[2]     Although not an issue in this action, Citigroup contests that the Power Agency is its customer.

and that the Power Agency must bring its claims, if at all, in this Court.

## COUNT II
### (For injunctive relief)

37.     Citigroup repeats and realleges paragraphs 1 through 36 as though fully set forth herein.

38.     The Power Agency has asserted claims for actual, compensatory, punitive, and consequential damages against Citigroup in the pending arbitration and, on information and belief, unless enjoined will continue to pursue such claims.

39.     Unless the Power Agency is enjoined from pursuing its claims in the arbitration, Citigroup will suffer irreparable harm because it will be forced to incur the expense of defending itself in the arbitration proceeding, in which the Power Agency seeks millions of dollars in damages, even though Citigroup is not legally compelled to arbitrate the Power Agency's claims.  Among other things, and unlike in court where the plaintiff is likely to prevail on a pre-discovery motion to dismiss, FINRA rules generally do not permit motions to dismiss until after the parties engage in discovery and claimant puts on its case-in-chief.  Being compelled to arbitrate a dispute one has not agreed to arbitrate constitutes irreparable harm.

40.     Citigroup has no adequate remedy at law because any post-arbitration challenge to an arbitrator's award would still require Citigroup to defend itself in an arbitration proceeding to which they did not consent.

41.     The Power Agency will suffer no irreparable harm in the event an injunction issues.

42.     The balance of equities weighs in favor of an injunction.

43.     The public interest would be served by enjoining the Power Agency from pursuing its time-barred and meritless claims against Citigroup in the FINRA Arbitration because the parties' Broker-Dealer Agreement precludes arbitration of this dispute.

### PRAYER FOR RELIEF

WHEREFORE, Citigroup respectfully requests that this Court enter an order:

(1)     Declaring that (a) FINRA is not an appropriate forum to resolve a dispute between Citigroup and the Power Agency pursuant to their agreements related to the Power Agency's 2004 issuance of auction rate securities; and (b) FINRA lacks jurisdiction over the pending arbitration, captioned *North Carolina Eastern Municipal Power Agency* v. *Citigroup Global Markets, Inc.*, FINRA No. 13-00004;

(2)     preliminarily and permanently enjoining the Power Agency from pursuing its claims against Citigroup in the pending arbitration before FINRA or in any other arbitration;

(3)     awarding Citigroup costs of suit; and

(4)     granting such other relief as may be just and proper.

March 13, 2012

Respectfully submitted,
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP.

By: _____

Jeh Charles Johnson
Julie E. Fink
jjohnson@paulweiss.com
jfink@paulweiss.com

1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for plaintiff Citigroup Global Markets Inc.*

# Exhibit A

**BEFORE THE**
**FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.**

Case Number _____ _____

---

NORTH CAROLINA EASTERN MUNICIPAL POWER AGENCY,

CLAIMANT,

-VS-

CITIGROUP GLOBAL MARKETS, INC.,

RESPONDENT.

---

## I. STATEMENT OF CLAIM

Claimant North Carolina Eastern Municipal Power Agency, ("NCEMPA" or "Claimant") respectfully submits this Statement of Claim against Respondent Citigroup Global Markets, Inc. ("Citi" or "Respondent").

### SUMMARY

1.      NCEMPA is a joint agency comprised of 32 cities and towns in eastern North Carolina. As a public body and body corporate and politic organized and existing under Chapter 159B of the General Statutes of North Carolina, NCEMPA provides wholesale bulk power service to its 32 members, each of which has owned and operated its electric system for over 80 years. Revenue from electricity sales goes toward the generation and purchase of power, the operation of the system, and to pay debt service. NCEMPA's participants provide retail electric service to approximately 243,200 customers in eastern North Carolina; an area that for many years has been dependent on agriculture and the textile industry.

516715v.3

2.      In 2004, NCEMPA sought to refinance prior indebtedness by issuing $222.975 million in floating rate bonds. At the recommendation of Citi, these bonds were issued in the form of auction rate securities ("ARS"). In making this recommendation, however, Citi did not disclose to NCEMPA that Citi's support bids were propping up the auction rate securities market and were necessary to achieve the represented interest payments. Citi failed to disclose these facts because they would have prevented NCEMPA from issuing ARS and ARS were more profitable to Citi than alternate products. For the next four years, Citi served as broker-dealer for NCEMPA's ARS, earning hundreds of thousands of dollars in periodic broker-dealer fees while continuing to fail to disclose that NCEMPA's financing structure was entirely dependent on Citi's support bids to function.

3.      From August 2007 through February 2008, auction failures in unrelated sectors of the ARS market caused the inventories held by ARS broker-dealers to rise rapidly. In February 2008, various broker-dealers, including Citi, decided without warning to stop supporting the ARS market.   The ARS market promptly collapsed, and the rates on NCEMPA's ARS skyrocketed.  As a result, NCEMPA paid much higher interest payments and sustained other damages, such as costs of refinancing and swap termination fees.  NCEMPA has brought this arbitration against Citi to recover the damages it sustained due to Citi's misrepresentations and omissions during the structuring process and during the four years that Citi served as broker-dealer for NCEMPA's bonds, all of which were clear violations of the duties Citi owed to NCEMPA.

# BACKGROUND

## A.    Auction Rate Securities

4.    ARS are long-term, variable-rate instruments with interest rates that reset at frequent periodic auctions.  In each auction, existing holders and prospective bidders state the interest rate they require to purchase or continue to hold the security in each auction.  In a typical ARS auction, bid orders are accepted starting with the lowest interest rate bid until all securities available for sale are matched with purchase orders.  The rate at which the final sell order is filled is known as the "clearing rate."  The clearing rate applies to the entire issue of ARS, including all other buy orders, and to the securities of existing holders who chose to hold rather than sell their securities in the auction.  This type of auction process is referred to as a "Dutch auction."

5.    ARS auctions are generally held every 7, 28, or 35 days.  Orders to purchase or sell ARS at auctions can be placed only through designated broker-dealers that manage the auctions of the ARS.  These broker-dealers (in this case, Citi) collect "buy" and "sell" orders and then forward them to the designated auction agent that administers the Dutch auction.

6.    If the bids received by the auction agent are insufficient to purchase all the ARS offered for sale at a particular auction, the auction "fails."  As a result, until the next successful auction, the ARS holders are unable to sell the securities that they hold (unless they can do so in a secondary market) and the interest rate on all ARS in the issuance jumps to a contractual "maximum" rate.

7.    Based on the reports of several financial media outlets and state and federal regulators, by February 2008, the ARS market had grown to approximately $330 billion in

516715v.3

outstanding securities.   Approximately half of this market (~$160 billion) was issued by municipal issuers like NCEMPA.

8.     Citi promoted the ARS structure to municipal issuers like NCEMPA as a means to borrow money long-term at short-term interest rates.   Citi also promoted ARS to investors interested in short-term investments (for example, to manage cash balances) as a money-market substitute that generally offered a slightly higher interest rate than a money-market fund. Underwriters preferred ARS to other variable-rate instruments because ARS generated larger fees for broker-dealers (e.g., ARS remarketing fees were typically 25 basis points, compared to ~7 basis points for variable-rate demand obligations ("VRDO")) and because ARS did not require a liquidity facility or letter of credit.

**B.     Unbeknownst to Most Market Participants, Broker-Dealers like Citi Propped Up Auctions for ARS**

9.     Unbeknownst to NCEMPA, the ARS market had historically functioned as promoted primarily because broker-dealers like Citi always placed support bids in every ARS auction for which they were the lead broker-dealer.   That is, prior to February 2008, Citi always placed a bid in every auction in which it was lead broker-dealer to prevent auction failure.   The other major broker-dealers commonly followed the same practice.   At all times, Citi was aware that if it stopped placing bids to prevent auction failures, many auctions would fail and the ARS product as a whole would fail.

10.     Upon information and belief, based on the findings of a study conducted by members of the Federal Reserve, press reports, and NCEMPA's own bidding data from its auction agent, a majority of Citi-led auctions would have failed in the absence of these support bids. For instance, a review of NCEMPA's bidding data shows that 91% of the Series 2004A-1,

4

76% of the Series 2004A-2, 76% of the Series 2004A-3, and 83% of the Series 2004B would have failed but for Citi's support bids. Citi placed a support bid in 100% of NCEMPA's auctions prior to the ARS market crash. The broker-dealers' support bidding thereby created the artificial appearance of a liquid and efficient market, enabling Citi to market its ARS capital-raising structure to issuers like NCEMPA and to market the securities themselves to institutional and retail investors as sound financial investments. For underwriters and broker-dealers, the apparent zero percent failure rate in ARS auctions was a critical means by which to create and foster trust in the ARS market, because ARS were marketed to investors as a money-market substitute. If traditional ARS investors were aware that there was a chance investors would be unable to quickly liquidate their ARS positions and would be stuck holding long-term variable-rate bonds, these traditional ARS investors would quickly abandon the product.

**C.      Interest Rates for ARS Spiked When Broker-Dealers Ceased Blanket Bidding**

11.      On February 12, 2008, Citi decided to stop submitting support bids for all of its lead broker-dealer auctions in the municipal ARS market. Over the next two days, other broker-dealers also ceased support for the market, and over 50% of all auctions failed.

12.      Once ARS auctions started to fail en masse, traditional ARS investors predictably abandoned the product, and ARS no longer generated the low short-term interest rates expected of a money-market like investment. Even for issuers whose ARS did not experience failures, the flight of the traditional ARS investor meant that ARS began to clear at interest rates at or above long-term fixed interest rates, much higher than the rates expected by issuers or generated by the substitute short-term products issuers could have issued instead of ARS.

**D.      ARS Issuers with High-Fixed Maximum Rates Were Particularly Affected**

13.     As discussed above, ARS structures contained a maximum or "penalty" rate to which the interest rate on the bonds would default in the event that there were not sufficient bids to clear an auction. Traditionally, and nearly universally prior to 2004, ARS had deployed a contractual maximum rate based on a formula: a short-term index (such as LIBOR, BMA, or commercial paper) multiplied by a percentage often based on an issuer's credit rating. So in a typical formula, an AAA-rated issuer might have a maximum rate of 125% of LIBOR, meaning that if there were insufficient bids to account for all the bonds in the auction, all holders of the bonds would be paid 125% of LIBOR until the next successful auction. Generally these ARS formulas would also have a statutory or contractual cap of a fixed rate percentage, meaning that the maximum rate would be set to the lesser of 125% of LIBOR or, say, 15%.

14.     Beginning in 2004 for municipal issuers, however, underwriters began suggesting that municipal issuers issue ARS with a contractual maximum rate equal to a high-fixed rate, such as 15%. With a high-fixed maximum rate, in the event that there were insufficient bids, the ARS would default to a maximum rate of 15%. Although ARS issues with high fixed maximum rates were issued by municipal issuers after 2004, many municipal issuers continued to issue ARS with formulaic maximum rates through 2007, and outstanding municipal ARS with formulaic maximum rates continued to clear normally (and at essentially the same interest rates as ARS with high-fixed maximum rates) until early 2008. Some municipal ARS with formulaic maximum rates remain outstanding today. Moreover, non-municipal issuers of ARS, such as corporations, student loan issuers, and closed-end funds, did not issue ARS with high-fixed maximum rates and suffered no notable market access issues.

15.     The effect of a high-fixed maximum rate was to inflict very substantial interest costs upon an issuer with a failed auction. That issuer would be forced to quickly refinance under

516715v.3

the strain of the much higher interest rate, thus clearing the failing ARS from the market and removing the bonds from broker-dealers' inventories. It also ensured that broker-dealers, who maintained substantial inventories of ARS due to their blanket bidding, would receive much higher interest payments for holding failing ARS in their inventories through refinancing.

16.     Following the collapse of the ARS market in February 2008, most ARS with formulaic maximum rates experienced continual auction failures. Yet because they had formulaic maximum rates, the resulting interest rates were often effectively capped at rates around 4-5%, many of which eventually declined to rates that were below 1%. By comparison, many ARS with high-fixed maximum rates never experienced an auction failure. Yet once the market collapsed and traditional ARS investors abandoned the products, ARS with high-fixed maximum rates would regularly clear at much higher rates. Because of the ARS structure chosen, when the ARS market collapsed in February 2008, ARS issuers with high-fixed maximum rates were much more exposed to high interest rates than issuers with formulaic maximum rates.

**E.     ARS Issuers' Troubles Were Compounded by Derivatives like Interest-Rate Swaps**

17.     Many municipal ARS issuers structured their ARS with a related derivative transaction, such as an interest-rate swap, in order to hedge interest rate risk and create an overall fixed-rate obligation. In a typical floating-to-fixed rate swap, an ARS issuer agrees to make fixed-rate payments to a counterparty (often an affiliate of the underwriter) in exchange for a floating-rate payment from the counterparty. The floating-rate payment was typically based on an index, such as the Bond Market Association ("BMA") or a percentage of LIBOR, which would be expected to track ARS interest rates such that the floating-rate payment and the payment on the ARS would cancel each other out. When the ARS and the interest-rate swap are combined, the ARS issuers' ultimate interest rate-related obligations would be expected to be the

7

fixed-rate payments on the swap and the administrative costs of the ARS. This structure is referred to as a "synthetic fixed-rate." The benefit of this synthetic fixed-rate structure is that it was expected to produce fixed-rate payment obligations, allowing for easier budgeting and predictability of an issuer's future interest obligations.

18.     One significant feature of interest-rate swaps is that, upon early termination, one party to the swap would likely owe the other a termination payment. The termination payment obligation is generally calculated based upon the present value of the parties' expected future payments under the swap (along with some additional considerations outlined in the particular swap contract). For a floating-to-fixed rate swap, the present value of the expected future interest payments fluctuates constantly based upon interest rate projections, meaning that the nominal termination value can be quite high even when a synthetic fixed-rate structure is working appropriately.

19.     When the ARS market collapsed, however, ARS issuers with interest rate swaps found that their derivative structures no longer functioned as promised by their underwriters. Because broker-dealers had stopped supporting the ARS market and traditional ARS investors had abandoned the product once the risk of auction failure materialized, ARS no longer generated short-term interest rates that matched the variable payments made by swap counterparties, meaning that the ARS issuers had to pay more to their ARS investors than they received from the swap counterparty. Accordingly, the interest obligations of an ARS issuer with a synthetic fixed-rate issuance stopped generating predictably low fixed-interest rates and began to increase as well as fluctuate wildly, particularly for ARS issuers with high-fixed maximum rates. In fact, in early-to-mid 2008, while ARS were clearing at extremely high rates, most short-term indexes actually declined, meaning that ARS issuers with interest rate swaps were making

8

substantially higher payments on their ARS at the same time that they were receiving substantially lower payments from their swap counterparties. And ultimately, ARS issuers who wanted to quickly refinance discovered that they were often locked into their interest rate swaps for many years and that their termination payments (which were no longer related to the rates being generated by their ARS) were often millions of dollars. In many cases, the swap counterparty that was due the large termination payment was an affiliate of the same underwriter that recommended the ARS structure.

### THE PARTIES

20.     Claimant, NCEMPA, is a public body and body corporate and politic organized and existing under Chapter 159B of the General Statutes of North Carolina. It is comprised of 32 cities and towns located in eastern North Carolina. NCEMPA provides wholesale bulk power service to its 32 members, each of which has owned and operated its electric system for over 80 years.

21.     Respondent, Citi (CRD #7059) is a registered brokerage firm with a principal place of business in New York, New York.

### FINRA'S JURISDICTION

22.     Respondent is a FINRA member. Claimant is a customer of Respondent, having procured and paid for Respondent's services as underwriter and broker-dealer, and this dispute arises from the business activities of Respondent, including but not limited to, underwriting and broker-dealing. The Claimant demands arbitration pursuant to FINRA Rule 12200.

### FACTUAL ALLEGATIONS

### <u>THE 2004 ISSUANCE</u>

9

**A.    In 2004, NCEMPA sought to refinance earlier debt, and engaged Citi as underwriter.**

23.    In 2004, NCEMPA began exploring ways to refinance earlier debt by issuing new bonds.

24.    NCEMPA hired Citi to serve as underwriter on its planned bond issuance. The parties agreed that the transaction would be "negotiated," meaning that Citi worked closely with NCEMPA to structure the 2004 bond issuance.

25.    Citi and its representatives actively participated in structuring and implementing NCEMPA's 2004 financing over the next few months.

26.    Citi ultimately advised NCEMPA on what it regarded as the appropriate capital-generation structure for NCEMPA's bonds; acted as NCEMPA's agent in dealing with the rating agencies; assisted with ARS-related discussions with bond insurers on NCEMPA's behalf; bought the initial ARS bonds from NCEMPA and resold them; sold a related interest rate swap to NCEMPA that supposedly supported the ARS structure; provided monitoring and advisory services regarding the bonds and the swap after the issuance; functioned as the only broker-dealer for NCEMPA's ARS auctions; and performed various other tasks as NCEMPA's advisor, agent, and fiduciary.

27.    In the course of structuring the 2004 bonds, Citi's representatives had regular telephone conferences and in-person meetings with NCEMPA's representatives. During this structuring period, Citi's representatives continually advised and made recommendations to NCEMPA and its representatives.

516715v.3

**B.**      **Citi recommended that NCEMPA issue $222.975 million of ARS.**

28.      In structuring NCEMPA's 2004 bonds, Citi recommended that NCEMPA structure its bonds as auction rate securities. Citi recommended that NCEMPA "issue a combination of tax-exempt and taxable auction rate bonds."[1] In promoting ARS, Citi stated that any risks associated with ARS could be "mitigated by bond insurance, ability to refinance with VRDOs."[2] Citi did not inform NCEMPA that there was no mitigation for the greatest risk associated with issuing ARS, namely that Citi might decide without warning to stop supporting the market.

29.      Citi also heavily promoted synthetic fixed-rate swaps in combination with the ARS issuance.  In an April 2004 presentation to NCEMPA, Citi emphasized its ability to "Mitigate the Primary Synthetic Fixed Rate Risks."[3] The presentation noted the risk of failed auctions resulting in a penalty rate, claiming that those risks were mitigated by bond insurance and the ability to refinance with VRDOs.[4] Similarly, Citi explained how it could mitigate the termination risk, credit risk and basis risk.[5]  In addition, Citi emphasized NCEMPA's savings from its prior swap program as compared to fixed rate bonds.[6]

30.      Citi continued its push for NCEMPA to enter synthetic fixed-rate swaps in combination with the 2004 ARS.  In May 2004 presentations, Citi touted the benefits of the

---

[1] *See* Ex. A, Citi Presentation, "Market Update and Financing Options for North Carolina Eastern Municipal Power Agency," April 16, 2004, at 11.
[2] *Id.* at 13.
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.* at 14.

11

swaps with ARS in a higher interest rate environment.[7] Citi claimed that synthetic fixed-rate swaps would "best utilize [the] added insurance capacity," by "provid[ing] the Agency with the ability to lock in rates today during a period of historically low interest rates."[8] In the May 26, 2004, presentation, Citi noted that its projections assumed that the "floating rate received from Citigroup equals the floating rate paid on the bonds."[9] This was only true if Citi continued to place its support bids in NCEMPA's auctions and if Citi continued to place these bids at rates that Citi promoted and NCEMPA had budgeted for.

31.     Relying on representations and recommendations by Citi's representatives about the benefits of ARS, NCEMPA decided to issue its 2004 bonds as ARS in conjunction with interest rate swaps.

**C.     Citi omitted material information about support bidding.**

32.     During these debt-structuring negotiations, Citi did not disclose that at the time it had a practice of placing bids to prevent failures in every auction for which it was lead broker-dealer, or that without these support bids auctions would fail, the ARS market would collapse, and lower interest costs would surely not be realized.

33.     A review of NCEMPA's bidding data for the 2004 Bonds demonstrates Citi's manipulative practice. Citi submitted a cover bid to prevent failure in 100 percent of NCEMPA's auctions for every series of NCEMPA's ARS, and Citi's support bids prevented auction failure in 91% of the Series 2004A-1, 76% of the Series 2004A-2, 76% of the Series 2004A-3, and 83%

---

[7] *See* Ex. B Citi Presentation, "Market Update and Financing Options for North Carolina Eastern Municipal Power Agency" May 7, 2004, at 7; Ex. C, Citi Presentation, "Market Update and Financing Options for North Carolina Eastern Municipal Power Agency" May 26, 2004, at 5.
[8] *Id.*
[9] *Id.* at 6.

of the Series 2004B. Thus, only a fraction of the auctions for the 2004 bonds would have succeeded but for Citi's support bids.

34. One obvious effect of this undisclosed blanket bidding practice was that ARS auctions led by Citi never failed because Citi's support bidding ensured they *could not fail* – Citi was placing a bid that made failure impossible in every single auction. Citi's own intervention ensured auction success.

35. Another effect of Citi's undisclosed blanket bidding practice was that the rate in ARS auctions was set at Citi's discretion. Citi's bids controlled whether ARS cleared at short-term variable interest rates or at a rate many times higher, because the majority of auctions were clearing at the rate chosen by Citi. This meant that if Citi decided, for internal reasons or for any reason, that it wanted to offload inventory or earn more interest on the ARS in its inventory, Citi could increase the clearing rate by simply increasing the rate at which it submitted bids. As a result, the price of ARS was not being set by market forces, which is what Citi and other ARS underwriters told customers like NCEMPA; rather, the price was set by Citi.

36. Had NCEMPA known that if it issued ARS it would be wholly-dependent on Citi's continued support bidding practice for the ARS market to function and for NCEMPA's ARS to generate the predicted short-term rates in its auctions, NCEMPA would never have taken the risk that Citi might decide to stop placing cover bids in the ARS market, as Citi did in February 2008. Instead, NCEMPA could have issued its bonds in an alternate structure. Moreover, NCEMPA would have never chosen to issue ARS tied to interest rate swaps, which would be outstanding for decades.

37. Citi's failure to inform NCEMPA about its material auction practices in 2004 and the risk that those auction practices posed to NCEMPA's ARS issuance was a violation of Citi's

13

obligations under federal and state securities laws, MSRB and NASD rules, as well as its duties as NCEMPA's underwriter and fiduciary under state law.

**D.      NCEMPA issues its ARS with a high fixed maximum rate.**

38.      In structuring the 2004 issuance, NCEMPA utilized a high fixed maximum rate: 15% for the Series 2004A bonds, and 18% for the Series 2004B bonds.

39.      Citi did not disclose to NCEMPA that Citi and other broker-dealers continued to underwrite municipal ARS with formulaic rates during this period or that Citi continued to manage auctions for ARS with formulaic rates that cleared at the same rates as high-fixed maximum rate auctions. A formulaic maximum rate would have provided protection to an issuer like NCEMPA, allowing an issuer to weather an ARS market collapse, like the collapse in February 2008, by preventing interest rates from spiraling out of control.

40.      Citi preferred a high fixed maximum rate, however, in order to protect itself from carrying low interest rate failed ARS bonds in its inventory if the market were to experience problems. It was thus in Citi's interest to withhold from NCEMPA the availability of formulaic maximum rates in 2004: a high-fixed maximum rate for the ARS made the bonds much more attractive to Citi and much less desirable for NCEMPA.

41.      When the ARS market collapsed in February 2008, the rates on NCEMPA's 2004 bonds quickly increased beyond rates for ARS with formulaic maximum rates, costing NCEMPA millions of dollars in excess interest payments. Although NCEMPA's auctions never failed, which would have resulted in either a 15% or 18% interest rate, the high fixed maximum rate allowed bidders in the auctions to submit bids well above the rates that auctions with formulaic maximum rates were clearing, and NCEMPA was often paying double-digit interest payments to the bondholders.

14

42.     The MSRB has recognized that underwriters have an obligation to deal fairly with issuers during the structuring of an issuance of ARS, and to provide all material information to issuers, including information about maximum rates. Citi's failure to inform NCEMPA about the availability of a formulaic maximum rate is a violation of Citi's obligations under MSRB and NASD rules. This failure caused a significant amount of NCEMPA's interest damages, and forced NCEMPA to refinance at a faster pace because of the higher interest payments.

**E. At Citi's recommendation, NCEMPA also entered into a swap agreement.**

43.     NCEMPA, at Citi's recommendation, also entered into a forward-starting, floating-to-fixed rate swap, which created "synthetic fixed-rate" structures for the 2004 ARS issuance. In its floating-to fixed rate swaps, NCEMPA had agreed to pay a fixed rate to the swap counterparty (3.651% Series A-1, 3.655% Series A-2, 3.644% Series A-3, 5.090% Series B) in exchange for floating rate payments from the counterparty (based on LIBOR) that were expected to match the payments NCEMPA would owe on the 2004 ARS.

44.     Citi was well aware, however, that NCEMPA's swaps would only function as represented, and the counterpayments from the swap counterparties would only offset the payments on the ARS, if Citi continued to place bids to support ARS. Nonetheless, Citi failed to disclose this information to NCEMPA, and recommended that NCEMPA issue its ARS with a swap transaction that locked NCEMPA into payments to a counterparty for many years.

45.     Citi's failure to inform NCEMPA that its bidding practices distorted the prices generated by the auctions is a clear violation of Citi's obligations under MSRB and NASD rules, including most notably MSRB rule G-17, which requires underwriters to ensure that an issuer is treated fairly: "When a dealer is negotiating the underwriting of municipal securities, the dealer has an obligation to negotiate in good faith with the issuer. Also if the dealer knows the issuer is

15

unsophisticated or *otherwise depending on the dealer as its sole source of market information,* the dealer's duty under rule G-17 is to ensure that the issuer is treated fairly specifically *in light of the relationship of reliance that exists between the issuer and the underwriter.*" MSRB G-17 Interpretive Letter, December 1, 2007 (emphasis added). Citi was well aware that NCEMPA was dependent on Citi to provide it information about the ARS market, and yet Citi did not inform NCEMPA about the effect their auction practices would have on NCEMPA's auctions.

46.     Underwriters like Citi, however, were not motivated to divulge the true nature of the ARS market because ARS were extremely profitable for the underwriters. Underwriters preferred ARS to alternative forms of debt issuance and they pushed the product on their customers because ARS were much more lucrative than alternative debt financings. Ongoing remarketing fees for ARS, or broker-dealer fees, were 25 basis points a year, nearly four times the 7 basis points a year underwriters would charge to remarket traditional variable-rate bonds.

47.     Also, ARS were often sold to ARS issuers in connection with interest-rate swaps, another money-maker for the underwriters. Revenue from the sale of a thirty-year floating-to-fixed rate interest swap could easily exceed the revenue from the rest of the underwriting combined. Accordingly, it was in Citi's interest to withhold information about the effect of its bidding practices on ARS liquidity from the market.

**F.     NCEMPA issued its 2004 bonds.**

48.     In May 2004, NCEMPA issued its Series 2004 bonds, totaling $222,975,000, as auction rate securities.

49.     Although NCEMPA's 2004 ARS appeared to produce low short-term interest rates, they only produced these rates because Citi placed support bids in the auctions, effectively masking that there was no natural market to support NCEMPA's auctions at short-term rates.

16

516715v.3

**G.    Citi's Management of NCEMPA's ARS Post-Issuance Masked the Fact that there was No True Independent Market for ARS**

50.    After the issuance of NCEMPA's ARS in 2004, Citi became the sole broker-dealer on the bonds. As the broker-dealer responsible for all bidding in NCEMPA's bonds, Citi earned a broker-dealer fee, equal to 25 basis points, or approximately $557,000 annually.

51.    As noted above, Citi's support bids in the auctions were the only thing preventing immediate auction failure for NCEMPA. Only between 9-24% of NCEMPA's auctions would have succeeded without Citi's intervention; amazingly Citi never informed NCEMPA that the vast majority of its auctions would have failed "but for" Citi's support bids. There was no publicly-available database where NCEMPA could have monitored the performance of its ARS prior to the creation of the MSRB's Electronic Municipal Market Access (EMMA) website, which was launched in 2008. Accordingly, NCEMPA was dependent on Citi to keep it informed about the health of its ARS. Had Citi informed NCEMPA of the precariousness of NCEMPA's financing, NCEMPA could have refinanced earlier, prior to the collapse of the market, but Citi would have lost out on its lucrative broker-dealer fees.

52.    The disclosure in the Official Statement for NCEMPA's 2004 bond issuance about Citi's bidding practices was not adequate to describe the reality of Citi's involvement in the ARS market. This disclosure was provided by Citi, the only party to the transaction with first-hand knowledge of Citi's bidding practices. The disclosure suggested only that Citi "may submit an Order in Auctions for its own account." This is a far cry from the truth, which is that Citi **always** placed a bid in **every** auction in which it was lead broker-dealer to prevent auction failure, and that Citi was aware **at all times** that if it failed to place a bid for its own account in

the auctions it managed, a large number (~50%) of the auctions **would fail** and the market for ARS **would collapse**.

53.     And once Citi began managing NCEMPA's auctions post-issuance, it was certainly aware that it had to bid in each of NCEMPA's auctions or roughly 76-91% of the auctions would fail.  A disclosure that Citi "may submit an Order in Auctions for its own account," does not adequately inform NCEMPA that Citi is bidding in 100% of NCEMPA's auctions to prevent near-certain failure.  As one colorful judge phrased it, "The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."[10]

54.     Notably, in May 2006, after a two-year investigation, most of the significant broker-dealers in the ARS market, including Citi, consented to a cease-and-desist order issued by the SEC.  That order, entered nearly a year after NCEMPA's ARS issuance, found that, without adequate disclosure, broker-dealers, including Citi, had placed "bids to prevent failed auctions" and "bids to set a 'market rate.'"  Citi paid a civil fine in response to the findings.

55.     Because Citi placed a support bid in each of NCEMPA's auctions, NCEMPA was unaware of the fragility of the ARS market in general.  Citi's support bidding strategy masked the fact that there was no true independent market for ARS.  As long as Citi continued to bid, NCEMPA remained unaware that its bond financing was in danger of collapse.

**H.     Citi Fails to Inform NCEMPA about Its Concerns about the ARS Market Prior to the Market Crash**

---

[10] *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y. 1996)

18

516715v.3

56.     In August 2007, there were a number of auction failures in ARS issued by corporations and closed-end funds, a different sector of the auction rate security market.  As a result of investor concern caused by these failures, banks found that their internal inventories of ARS were rising rapidly, and banks began discussing internally whether they were going to continue to support this market.  Internally at Citi, as at other broker-dealers, banks began to set limits on the inventory exposure they would accept in ARS, and to discuss exit strategies, including allowing widespread auction failure, if inventories rose too high.  Over the months following August 2007, broker-dealer inventories multiplied, and internal chatter increased about exiting the ARS market.  Although NCEMPA was paying Citi to manage its auctions throughout this period, Citi never discussed these concerns with NCEMPA.

57.     Sadly, Citi continued to misrepresent the ARS market and its involvement in it as the market began to unravel in Fall 2007.  In December 2007, Citi made a presentation to NCEMPA about the state of the market. On December 18, 2007, Citi touted the success of the ARS bonds during the past 13 months as having "outperformed VRDOs 67% of the time" but that that trend had reversed since August 2007. [11] Noting the recent "market dislocation," Citi told NCEMPA that the Series 2004A bonds had "widened significantly compared to their historical averages" due to the "subprime market de-valuation and resulting liquidity tightening, combined with the rating agencies announcement of their review of bond insurer ratings."[12] It was those factors, Citi claimed, that "resulted in higher ARS resets relative to historic norms."[13] Nowhere in the presentation did Citi fully disclose its internal concerns about rising inventories and the cost of continuing to support the market.

---

[11] *See* Ex. D Citi Presentation, "Floating Rate Analysis," Dec. 18, 2007, at 2.
[12] *Id.* at 1-2.
[13] *Id.* at 3.

516715v.3

58.     On January 22, 2008, Citi made another presentation to NCEMPA concerning the state of the ARS market.  In that presentation, Citi evaluated three possible strategies for NCEMPA to consider in response to the "dislocation" in the ARS market.[14] One of Citi's strategies was that NCEMPA "[d]o nothing" with its outstanding ARS.[15] Citi noted that this approach included "[u]ncertainty if the ARS market will ever return to 'normal'" and a "[p]ossibility that a failed auction will lead to maximum rate" on the 2004 bonds.[16] Unfortunately, the market update did not fully divulge Citi's own concerns about the market, especially the fact that the bank had been discussing an exit strategy from the market for months, as a full review of Citi's internal emails will reveal.  And in neither of these updates did Citi disclose the principal problem with the market, that it was entirely dependent on broker-dealer support and that as a result of rising inventories, the broker-dealers were likely to cease their support and allow the market to collapse in the near future.

59.     In the December 2007 and January 2008 presentations to NCEMPA, Citi failed to fully divulge its concerns about the market, especially the fact that the banks had been discussing an exit strategy from the market for months, like every other ARS underwriter/broker-dealer. For instance, Citi's auction desk was aware that the ARS market was crumbling in late 2007, as quoted by the SEC in its 2008 Complaint against the investment bank:

- "[O]n August 16, 2007, Short-Term Trading management emailed senior management, 'We need to discuss the current state of the auction rate market, our commitment to the auctions, its impact on our balance sheet and the effect of our auctions on our clients...our actions will have broad-reaching implications to all of our constituents, the market, and our franchise.'"[17]

---

[14] *See* Ex. E, Citi Presentation, January 22, 2008, at 3.
[15] *Id.*
[16] *Id.*
[17] *See* Ex. F, *SEC v. Citigroup Global Markets, Inc.*, Complaint, Dec. 11, 2006, at ¶ 34

516715v.3

- A November 1, 2007 internal email stated "Since the credit crisis hit this summer, the ARS market has been under pressure caused by investor risk aversion and other dealers' failed auctions… As a result, liquidity has been thinning. Given the difficulty of monolines… we are very concerned that further investor pullback could increase the risk of widespread failed auctions."[18]

60.     Accordingly, in December 2007 and January 2008 when Citi's internal ARS traders were very concerned that the ARS market was crumbling and that investors and issuers alike had been misled by Citi's bidding practices about the liquidity of the market, Citi was still misrepresenting the realities of the ARS market to NCEMPA. Unfortunately, only 21 days after the January 2008 presentation to NCEMPA, Citi pulled the plug on its ARS bidding, along with other ARS underwriters/broker-dealers, and the market crashed.

61.     Citi failed to divulge its true concerns about the ARS market in Fall 2007 and January 2008 because it was more concerned about upcoming transactions and additional future business with NCEMPA and didn't want the reality of the ARS market to cause NCEMPA to pull its business from the banks. For instance, a majority of Citi's January 22, 2008, presentation to NCEMPA focused not on the ARS market turmoil, but rather analyzed NCEMPA's current and future capital structure with an eye toward replacing fixed rate debt with hedged variable rate debt in 2008 and 2009.[19] NCEMPA was exploring issuing additional refunding bonds in 2008, and Citi was interested in playing a role in -- and profiting from -- the refinancing. Sounding the alarm bell about the ARS market in Fall 2007 or January 2008 to NCEMPA might have jeopardized the profit that Citi's affiliates would reap from the additional transactions.

62.     Instead of providing an adequate warning to NCEMPA in Fall 2007 or January 2008 about the $222.775 million in ARS that NCEMPA had outstanding from its 2004 bond

---

[18] *Id.* at ¶ 57.
[19] *See* Ex. E, Citi Presentation, January 22, 2008, at 5-35.

issuance, Citi kept silent about its internal knowledge about the fragility of the ARS market because it was seeking additional transactions and future financings with NCEMPA. As the market approached complete collapse, Citi put its own self-interest above that of its clients, motivated by a desire to reap more profit and collect more fees.

**G.     In February 2008, the ARS market collapsed and NCEMPA's structure failed.**

63.     In February 2008, Citi stopped placing blanket bids in auctions generally, and NCEMPA's ARS rates skyrocketed to between 7-11% as NCEMPA's interest payments increased dramatically.   Those higher interest payments no longer matched the payments NCEMPA received from its swap counterparty, meaning the "synthetic fixed rate" structure essentially failed.

64.     ARS investors quickly fled the market, and ARS no longer generated short-term interest rates that matched the payments NCEMPA received from its swap counter-party. Accordingly, NCEMPA's interest payments skyrocketed. NCEMPA rapidly refinanced its 2004 ARS in May 2008, at considerable cost in refinancing fees and related costs. NCEMPA refinanced all of its 2004 ARS as fixed-rate bonds at a considerably higher rate than it could have obtained in earlier periods. And to compound the injury, NCEMPA had to unwind its swap, incurring a termination fee of approximately $18 million.

65.     Subsequent to the collapse of the market in February 2008, NCEMPA and the broader market discovered that broker-dealers, like Citi, had been propping up the ARS market and had allowed its 2008 collapse.   In particular, there were a number of investigations into broker-dealer support of the auctions post market-collapse by the SEC and State Attorneys-General.

516715v.3

66.    The SEC launched new investigations into broker-dealers' roles in the ARS market, notwithstanding the generic disclosures that broker-dealers like Citi started distributing in August 2006 as a result of the previous SEC investigation. Citi entered a Consent Order to settle the SEC's enforcement action, agreeing to a permanent injunction from further violations of the Exchange Act, and to buyback $7.5 billion worth of ARS immediately and liquidate a further $12 billion of ARS over the following twelve months.[20]

67.    As noted in the SEC's Complaint filed against Citi in the wake of the ARS market crash, the investment banks had discussed internally abandoning the market beginning in Fall 2007. The SEC's Complaint stated that the investment bank "misled tens of thousands of its customers regarding the fundamental nature and increasing risks associated with auction rate securities ("ARS") that Citi underwrote, marketed and sold."[21] The SEC documented Citi's abandonment of the ARS market in February 2008:

> Citi historically had committed its own capital to support ARS auctions for which it served as the lead manager so that those auctions did not fail. During the fall of 2007, the credit crisis and deteriorating market conditions caused Citi to have to support its auctions to a greater extent. Citi knew the ARS market was deteriorating and Citi's inventory of ARS was significantly increasing. According, Citi knew the risk of failed auctions had materially increased. Citi knew these facts but did not disclose to its customers timely, complete, and accurate information about them. In mid-February 2008, Citi decided to stop supporting the auctions.[22]

68.    The damages incurred by NCEMPA – additional unbudgeted interest payments, refinancing costs, and swap termination fees – totaled millions of dollars. Through this arbitration, as explained in the Claims section of this submission, NCEMPA seeks to recover the

---

[20] See Ex. G, Consent of Defendant Citigroup Global Markets Inc., Civil Action No. 08-10753, S.D.N.Y.; Ex. H, SEC Press Release 2008-168, *Citigroup Agrees in Principle to Auction Rate Securities Settlement*, Aug. 8, 2008.

[21] See Ex. F, *SEC v. Citigroup Global Markets, Inc.*, Complaint, Dec. 11, 2006, at ¶1.

[22] *Id.* at ¶1-2.

23

damages it has suffered as a result of Citi's serial breaches of its duties as NCEMPA's advisor and fiduciary and under MSRB and NASD rules, as well as damages incurred as a result of Citi's omissions of material information during the underwriting of NCEMPA's bonds and during the four years while JPMorgan served as broker-dealer for NCEMPA's bonds. NCEMPA seeks to recover, among other costs, its excess interest payments on ARS, refinancing costs, excess interest payments on the refinanced bonds, and swap termination fees. NCEMPA reserves the right to supplement these damages as discovery progresses.

## CAUSES OF ACTION

### Count I:  Breach of Fiduciary Duty

69.    In connection with the issuance of NCEMPA's 2004 ARS, Citi advised NCEMPA to issue its bonds as ARS, and Citi acted with respect to NCEMPA with superior knowledge of market risks and opportunities.  Citi had superior knowledge about the ARS structure and the ARS market, and NCEMPA placed its trust and confidence in Citi and relied on its superior knowledge about how the ARS market worked, the state of the ARS market, and what the important material risks were.  Citi actively encouraged NCEMPA to place trust and confidence in it, was aware that NCEMPA was placing its trust and confidence in Citi's superior knowledge and expertise, and willingly accepted this position of trust.  As a result, Citi owed fiduciary duties to NCEMPA.

70.    Despite its fiduciary obligations, Citi failed to disclose to NCEMPA material facts, including (a) the extent to which its blanket bid practice created and manipulated the market for ARS generally; and (b) the extent to which its active manipulation of the ARS market disguised the lack of natural demand for ARS.  These omissions, which began during the underwriting process and continued throughout the next four years as Citi placed support bids as

24

516715v.3

NCEMPA's broker-dealer, materially misled NCEMPA to its great prejudice, as reflected in the collapse of NCEMPA's debt structure and the higher interest costs suffered by NCEMPA after the ARS market's collapse.   Citi's breach of its fiduciary duty benefited Citi and injured NCEMPA, as outlined above.

71.     Citi breached the fiduciary duty it owed to NCEMPA.   Citi is liable for all damages sustained as a result of its breach of its fiduciary duty.

### Count II: Fraud

72.     As noted throughout this Statement of Claim and in paragraph 69 above, Citi made numerous misrepresentations of, and failed to disclose, many material facts to NCEMPA. These misrepresentations and omissions were made to obtain an unjust advantage over NCEMPA. These misrepresentations began during the structuring process for the 2004 ARS bonds and continued until the collapse of the ARS market as Citi continued to place blanket support bids in all of NCEMPA's auctions, masking the fact that there was no true independent market for ARS.

73.     In light of its position of superior knowledge and its role as a municipal underwriter in negotiated transactions, Citi unquestionably had a duty to provide accurate information about ARS market practices and conditions to NCEMPA.   This duty is further confirmed by the MSRB rules, which directly mandate such disclosure.

74.     The omitted facts were unquestionably material to NCEMPA's decision to issue ARS.   Had NCEMPA known that the ARS market was wholly dependent on Citi's support bids and that if broker-dealers like Citi ceased their support bidding policy the market would collapse and cease generating short-term interest rates, NCEMPA would never have chosen to issue ARS.

25

75.     Citi was well aware that NCEMPA was relying on Citi to provide accurate information about the ARS market, and that Citi was better positioned to have accurate information about its own bidding practices and the broader ARS market than NCEMPA. NCEMPA justifiably relied on Citi, given that NCEMPA was paying Citi to provide fair and accurate debt-structuring advice as required by MSRB and NASD rules. Yet Citi chose to remain silent about these facts because of the profits Citi stood to gain from the transactions.

76.     Citi's fraudulent actions have unquestionably caused damage to NCEMPA, as outlined above.   Citi is liable for all damages sustained as a result of its fraudulent misrepresentations and concealment.

### Count III: Negligent Misrepresentation

77.     NCEMPA specifically incorporates the allegations contained in Count II as set forth herein.

78.     Citi breached its duty to NCEMPA by negligently misrepresenting material facts about the ARS market, the extent of its involvement in propping up the ARS market, and the material risks in the transactions that it recommended. These misrepresentations were made by Citi to induce NCEMPA to issue ARS, a form of debt that was more lucrative for Citi than alternative structures. The misrepresentations continued for the next four years as Citi served as NCEMPA's broker-dealer and placed support bids in all of NCEMPA's ARS auctions, preventing NCEMPA from discovering the true nature of the ARS market and refinancing into an alternative debt structure prior to the ARS market crash.

79.     As a direct and proximate result of Citi's breach, NCEMPA suffered damage as described herein. Citi is liable for all damages sustained as a result of its negligent misrepresentations.

516715v.3

**Count IV: Violation of §10(b) of the Exchange Act and Rule 10b-5**

80.    In advising that NCEMPA should issue ARS and in buying the ARS from NCEMPA, Citi failed to disclose several obvious material facts such as that, but for Citi's support bids, there was not a sufficient market to sustain the auctions and to generate the short-term interest rates necessary to sustain NCEMPA's financing structure and that the ARS market would effectively collapse in the event Citi cased its support bidding.

81.    Citi acted recklessly and had fraudulent motives when dealing with NCEMPA. Although the ARS were not the most desirable structure for NCEMPA, they were more lucrative for Citi than other debt structures.  Citi failed to disclose the true nature of the ARS market to NCEMPA during the structuring process, and Citi's constant support bidding ensured that NCEMPA did not discover the reality of the ARS market and seek an alternative debt structure.

82.    Citi thus deliberately concealed its support bid practices in advising NCEMPA to issue ARS.  As a direct and proximate results of Citi' omissions and misrepresentations, NCEMPA has been damaged as outlined above, and Citi is liable pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder.

**Count V: Violation of North Carolina Securities Act**

83.    NCEMPA specifically incorporates the allegations contained in Count IV as set forth herein.

84.    Citi's misrepresentations and omissions to NCEMPA are also violations of the North Carolina Securities Act, N.C.G.S. § 78A-1, *et seq.* The information withheld by Citi would have significantly affected the issuance decision of any reasonable issuer, and specifically affected the issuance decision of NCEMPA and NCEMPA's decision to stay in ARS for the next four years.

27

516715v.3

85.     As a result of Citi's actions and omissions, NCEMPA suffered significant damages, for which Citi is liable under the North Carolina Securities Act, N.C.G.S. § 78A-1, *et seq.*

### Count VI: Breach of MSRB and NASD duties

86.     The SEC and FINRA have recognized that a claimant may assert a claim in FINRA arbitration for violations of MSRB and NASD rules which cause harm to the claimant. Citi's actions, misrepresentations, and omissions as laid out in the statement of claim constitute violations of the following MSRB and NASD rules:

- MSRB Rule G-17, requiring that each "broker, dealer, municipal securities dealer, and municipal advisor shall deal fairly with all persons [including issuers] and shall not engage in any deceptive, dishonest, or unfair practice";

- NASD Rule 2310-2 and 2310-3, requiring that NASD members "make every effort to make customers aware of the pertinent information regarding [new financial] products" and ensure that the customer understands the risks of the product";

- NASD Rule 2210(d)(1)(A), requiring that all member communications "shall be based on principles of fair dealing and good faith, must be fair and balanced, and must provide a sound basis for evaluating the facts in regard to any particular security or type of security, industry or service.  No member may omit any material fact or qualification if the omission, in the light of the context of the material presented, would cause the communications to be misleading."

87.     As outlined above, Citi's actions, misrepresentations, and omissions demonstrate that it did not deal fairly with NCEMPA, and as a result NCEMPA sustained extensive damages. Citi is liable for all damages caused by its violations of MSRB and NASD rules.

88.     NCEMPA reserves the right to assert additional causes of action as discovery progresses.

## PRAYER FOR RELIEF

WHEREFORE, NCEMPA prays that this Statement of Claim be deemed good and sufficient, and that after due proceedings had, there be an award in its favor of:

a.      Actual damages;

b.      Compensatory damages;

c.      Punitive damages;

d.      Consequential damages;

e.      Restitution and disgorgement of all fees and costs associated with issuing the ARS, conducting the auctions, and any and all other associated fees and costs;

f.      The costs of prosecuting this action, together with interest, including pre- and post-judgment interest,

g.      Reasonable attorneys' fees in connection with the prosecution of this case; and

h.      All other appropriate legal or equitable relief deemed appropriate.

516715v.3

December 21, 2012

Respectfully submitted,


_____/s/ Joseph C. Peiffer_____
James R. Swanson
Joseph C. Peiffer
Jason W. Burge
Lara K. Richards
Fishman Haygood Phelps
Walmsley Willis & Swanson, LLP
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana  70170-4600
Telephone:  (504) 586-5252
Facsimile:  (504) 586-5250

Garrett W. Wotkyns
Jennifer Estremera
Schneider Wallace Cottrell Brayton Konecky LLP
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0144
Facsimile: (866) 505-8036

Peter Mougey
James Kauffman
Levin, Papantonio, Thomas, Mitchell, Rafferty &
Proctor,P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL  32502
Office:  (850) 435-7072
Fax:     (850) 436-6068

Counsel for North Carolina Eastern Municipal
Power Agency

516715v.3

# Exhibit B

BROKER-DEALER AGREEMENT


Dated June 1, 2004


among


DEUTSCHE BANK TRUST COMPANY AMERICAS,
As Auction Agent


and


CITIGROUP GLOBAL MARKETS INC.


and

NORTH CAROLINA EASTERN MUNICIPAL POWER AGENCY


relating to


$222,975,000


North Carolina Eastern Municipal Power Agency
Power System Revenue Bonds, Refunding Series 2004A
and
Power System Revenue Bonds, Refunding Series 2004B (Federally Taxable)


412530.9 027224 AGMT

# TABLE OF CONTENTS

**Page**

SECTION 1.  DEFINITIONS AND RULES OF CONSTRUCTION.

    1.1.  Terms Defined by Reference to the Bond Resolution ........................................1
    1.2.  Terms Defined Herein..................................................................................2
    1.3.  Rules of Construction ...............................................................................2
    1.4.  Warranties of BD .....................................................................................3

SECTION 2.  THE AUCTION.

    2.1.  Purpose; Incorporation by Reference of Auction Procedures and
           Settlement Procedures. ..........................................................................3
    2.2.  Preparation for Each Auction. ...................................................................4
    2.3.  Auction Schedule; Method of Submission of Orders. ....................................4
    2.4.  Notices.................................................................................................6
    2.5.  Compensation. .......................................................................................6
    2.6.  Settlement............................................................................................7

SECTION 3.  THE AUCTION AGENT.

    3.1.  Duties and Responsibilities of the Auction Agent.........................................8
    3.2.  Rights of the Auction Agent.....................................................................8
    3.3.  Auction Agent's Disclaimer .....................................................................9

SECTION 4.  DISCLOSURE; INDEMNIFICATION.

    4.1.  Disclosure.............................................................................................9
    4.2.  Indemnification and Contribution............................................................10

SECTION 5.  MISCELLANEOUS.

    5.1.  Resignation and Removal of BD ..............................................................11
    5.2.  Termination .........................................................................................11
    5.3.  Participant............................................................................................11
    5.4.  Communications.....................................................................................11
    5.5.  Entire Agreement..................................................................................12
    5.6.  Benefits; Successors and Assigns.............................................................12
    5.7.  Amendment; Waiver. .............................................................................13
    5.8.  Severability...........................................................................................13
    5.9.  Execution in Counterparts.......................................................................13
    5.10. Governing Law; Jurisdiction; Waiver of Trial by Jury...................................13
    5.11. No Implied Duties.................................................................................13
    5.12. Auction Agreement; Auction Agent Principal Office ...................................13

i

## BROKER-DEALER AGREEMENT

THIS BROKER-DEALER AGREEMENT, dated June 1, 2004 (the "Broker-Dealer Agreement"), among (i) DEUTSCHE BANK TRUST COMPANY AMERICAS (the "Auction Agent"), a New York trust company, not in its individual capacity but solely as agent of JPMORGAN CHASE BANK (the "Bond Fund Trustee"), as Bond Fund Trustee under Resolution No. R-2-82 adopted by the Board of Commissioners of the Issuer hereafter mentioned on April 1, 1982, as amended, as supplemented by Resolution No. BDR-8-04 adopted by the Board of Directors of the Issuer on May 7, 2004, including as a part thereof the Series Certificate dated June 1, 2004 (the "ARS Resolution" and, together with said Resolution No. R-2-82 as amended, the "Bond Resolution"), pursuant to authority granted to the Auction Agent in the Auction Agreement, dated June 1, 2004 (the "Auction Agreement"), between the Bond Fund Trustee and the Auction Agent, as acknowledged by the Issuer; (ii) CITIGROUP GLOBAL MARKETS INC., a Delaware corporation ("BD"); and (iii) NORTH CAROLINA EASTERN MUNICIPAL POWER AGENCY (the "Issuer");

## WITNESSETH

WHEREAS, the Issuer is issuing $222,975,000 in aggregate principal amount of its Power System Revenue Bonds, Refunding Series 2004A and Refunding Series 2004B (Federally Taxable) (the "ARS" or "ARS Bonds"); and

WHEREAS, BD is to perform certain duties set forth herein; and

WHEREAS, the ARS Resolution provides that, except as provided therein, the interest rate on the ARS shall be the ARS Rate which shall be, except as otherwise provided therein, the rate per annum that the Auction Agent determines to have resulted from the implementation of the Auction Procedures; and

WHEREAS, Deutsche Bank Trust Company Americas has been appointed as Auction Agent for purposes of the Auction Agreement, and pursuant to Section 2.6(a) of the Auction Agreement, the Issuer has requested and directed the Auction Agent to execute and deliver this Broker-Dealer Agreement; and

WHEREAS, the Auction Procedures require the participation of one or more Broker-Dealers;

NOW, THEREFORE, the Auction Agent, as agent for the Bond Fund Trustee, BD, for the benefit of the Existing Owners and the Potential Owners of the ARS, and the Issuer agree as follows:

SECTION 1.   DEFINITIONS AND RULES OF CONSTRUCTION.

1.1.   *Terms Defined by Reference to the Bond Resolution.*  Capitalized terms not defined herein shall have the respective meanings specified in the ARS Resolution, including without limitation Section 1.1(b) of the aforesaid Resolution No. BDR-8-04 and Appendix A to the aforesaid Series Certificate. Unless otherwise specified, Section references to the Auction Agreement refer to such Sections in the Auction Agreement.

1.2.    *Terms Defined Herein.*   As used herein and in the exhibits hereto, the terms defined in the first paragraph and preambles to this Broker-Dealer Agreement shall have the respective meanings specified in such first paragraph or preambles, as the case may be, unless the context otherwise required.  As used herein and in the exhibits hereto, the following terms shall have the following meanings, unless the context otherwise requires.

(a)    "Auction" shall have the meaning prescribed by Section 2.1(a).

(b)    "Authorized Officers" shall mean each Vice President, Assistant Vice President and Associate of the Auction Agent assigned to its Trust & Securities Services group and every other officer or employee of the Auction Agent designated as an "Authorized Officer" for purposes hereof in a communication to the BD.

(c)    "BD Officer" shall mean each officer or employee of BD designated as a "BD Officer" for purposes of this Broker-Dealer Agreement in a communication to the Auction Agent.

(d)    "Broker-Dealer Agreement" shall mean this Broker-Dealer Agreement and any substantially similar agreement among the Auction Agent, the Issuer and a Broker-Dealer.

(e)    "Disclosure Statement" shall have the meaning prescribed by Section 4.1(b).

(f)    "1933 Act" shall mean the Securities Act of 1933, as amended.

(g)    "Official Statement" shall mean the Official Statement dated May 27, 2004, including any supplement or amendment, of the Issuer relating to the ARS Bonds.

(h)    "Person" shall mean an individual, association, unincorporated organization, corporation, partnership, joint venture, business trust or a government or an agency or a political subdivision thereof, or any other entity.

(i)    "Settlement Procedures" shall mean the Settlement Procedures for the ARS and shall be substantially in the form attached hereto as EXHIBIT A.

1.3.    *Rules of Construction.*   Unless the context or use indicates another or different meaning or intent, the following rules shall apply to the construction of this Broker-Dealer Agreement:

(a)    Words importing the singular number shall include the plural number and vice versa.

(b)    The captions and headings herein are solely for the convenience of reference and shall not constitute a part of this Broker-Dealer Agreement nor shall they affect its meaning, construction or effect.

2

(c)    The words "hereof," "herein," "hereto," "hereunder" and other words of similar import refer to this Broker-Dealer Agreement as a whole and not to any particular Section or other subdivision.

(d)    All references herein to a particular time of day shall be to New York City time.

(e)    Each reference to the purchase, sale or holding of ARS shall refer to beneficial ownership interests in ARS unless the context clearly requires otherwise.

(f)    Any reference herein to Bonds, ARS or ARS Bonds shall be deemed to be references to each series or subseries of Bonds, ARS and ARS Bonds. References herein to an Auction and the Auction Procedures shall apply separately to each series or subseries of ARS.

1.4.   *Warranties of BD.*  BD hereby represents and warrants that this Broker-Dealer Agreement has been duly authorized, executed and delivered by BD and that, assuming the due authorization, execution and delivery hereof by the Auction Agent, this Broker-Dealer Agreement constitutes a valid and binding agreement of BD, enforceable against it in accordance with its terms.

SECTION 2.  THE AUCTION.

2.1.   *Purpose; Incorporation by Reference of Auction Procedures and Settlement Procedures.*

(a)    The Auction Procedures will be followed by the Auction Agent for the purpose of determining the ARS Rate for each Auction Period after the Initial Period for the ARS Bonds. Each periodic implementation of such procedures is hereinafter referred to as an "Auction."

(b)    All of the provisions contained in the Auction Procedures and the Settlement Procedures are incorporated herein by reference in their entirety and shall be deemed to be a part of this Broker-Dealer Agreement to the same extent as if such provisions were fully set forth herein.

(c)    BD agrees to act as, and assumes the obligations of, and limitations and restrictions placed upon, a Broker-Dealer under this Broker-Dealer Agreement. BD understands that other Persons meeting the requirements specified in the definition of "Broker-Dealer" contained in the Bond Resolution may execute Broker-Dealer Agreements and participate as Broker-Dealers in Auctions. BD agrees to handle customer orders in accordance with its respective duties under applicable securities laws and rules.

(d)    BD and other Broker-Dealers may participate in Auctions for their own accounts. The Issuer may, however, by notice to BD and all other Broker-Dealers, prohibit all of the Broker-Dealers from submitting Bids in Auctions for their own accounts, provided that Broker-Dealers may continue to submit Hold Orders and Sell Orders. Notwithstanding the foregoing, if BD is an affiliate of the Issuer it may not submit Bids to purchase ARS in Auctions

3

for its own account, but may submit Hold Orders and Sell Orders in Auctions with respect to ARS otherwise acquired for its own account. The Auction Agent shall be under no duty or liability with respect to monitoring compliance with this Section 2.1(d).

2.2.    *Preparation for Each Auction.*

(a)    Not later than 9:30 A.M. on each Auction Date, the Auction Agent shall advise the Broker-Dealers by telephone or other electronic communication acceptable to the parties of the All Hold Rate and the ARS Index.

(b)    On the Closing Date and from time to time thereafter as the Auction Agent shall request, BD shall provide the Auction Agent with a list, substantially in the form of EXHIBIT F hereto, of the names of its customers that it believes are Existing Owners of ARS and the principal amount of ARS held by each of such customers. The Auction Agent shall not disclose any such information so provided to any Person other than the Bond Fund Trustee, the Issuer or BD except as otherwise required by law; provided, however, that the Auction Agent reserves the right and is authorized to disclose any such information if (i) it is ordered to do so by a court of competent jurisdiction or a regulatory, judicial or quasi-judicial agency or authority having the authority to compel such disclosure, (ii) it is advised by its counsel that its failure to do so would be unlawful or (iii) failure to do so would expose the Auction Agent to loss, liability, claim, damage or expense for which it has not received indemnity satisfactory to it.

(c)    Not later than 3:00 P.M. on the Record Date preceding each Auction Date, the Auction Agent shall notify BD of any change in the aggregate principal amount of ARS, as of the opening of business on such Record Date by delivering a notice to BD by telecopy or other electronic communication acceptable to the parties.

2.3.    *Auction Schedule; Method of Submission of Orders.*

(a)    The Auction Agent shall conduct Auctions for the ARS in accordance with the schedule set forth below. Such schedule may be changed at any time by the Auction Agent at the written direction of the Issuer to reflect then currently accepted market practices for similar auctions. The Auction Agent shall give notice of any such change to BD, the Issuer and the Bond Fund Trustee, which notice shall be given prior to the close of business on the Business Day next preceding the first Auction Date on which any such change shall be effective.

4

**Intentionally Left Blank**

(for the purposes of this Broker-Dealer Agreement, any telecopy or similar writing or other electronic communication acceptable to the parties shall be deemed to be in writing) and shall be given to such party, addressed to it, at its address or telecopy number set forth below and, where appropriate, reference the particular Auction to which such notice relates:

| | |
|---|---|
| If to BD addressed: | CITIGROUP GLOBAL MARKETS INC.<br>390 Greenwich Street, 5th Floor<br>New York, New York 10013<br>Attention: Auction Rate Trading<br>Telephone No.: (212) 723-7082<br>Telecopier No.: (212) 723-8809 |
| If to the Auction Agent addressed: | DEUTSCHE BANK TRUST COMPANY AMERICAS<br>Trust and Securities Services<br>60 Wall Street, 27th Floor<br>New York, NY 10005<br>Attention: Auction Rate Group<br>Telephone Number: (212) 250-6645<br>Telecopier Number: (212) 797-8600 |
| If to the Issuer addressed: | NORTH CAROLINA EASTERN MUNICIPAL POWER AGENCY<br>1427 Meadowwood Boulevard<br>Raleigh, North Carolina 27604<br>Attention: Chief Financial Officer<br>Telephone Number: (919) 760-6319<br>Telecopier Number: (919) 760-6050<br>E-mail: aconyers@electricities.org |

or such other address, telecopy number or e-mail address, if any, as such party may hereafter specify for such purpose by notice to the other party. Each such notice, request or communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopy number specified herein or (ii) if given by any other means, when delivered at the address specified herein. Communications shall be given on behalf of BD by a BD Officer and on behalf of the Auction Agent by an Authorized Officer.

5.5. *Entire Agreement*. This Broker-Dealer Agreement, and the other agreements and instruments executed and delivered in connection with the issuance of the ARS, contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements or understandings, oral, written or inferred, between the parties relating to the subject matter hereof.

5.6. *Benefits; Successors and Assigns*. This Broker-Dealer Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the respective successors and assigns of BD and the Auction Agent. Nothing in this Broker-Dealer Agreement, express or implied, shall give to any Person, other than the Auction Agent, BD and the Series 2004 Bond

12

412530.9 027224 AGMT

Insurer and their respective successors and assigns, any benefit of any legal or equitable right, remedy or claim under this Broker-Dealer Agreement, other than the rights expressly granted to the Issuer herein.

5.7.   *Amendment; Waiver.*

(a)      This Broker-Dealer Agreement shall not be deemed or construed to be modified, amended, rescinded, canceled or waived, in whole or in part, except by a written instrument signed by a duly authorized representative of each of the parties hereto and the Series 2004 Bond Insurer.

(b)      Failure of any party to this Broker-Dealer Agreement to exercise any right or remedy hereunder in the event of a breach of this Broker-Dealer Agreement by any other party shall not constitute a waiver of any such right or remedy with respect to any subsequent breach.

5.8.   *Severability.*   If any clause, provision or section of this Broker-Dealer Agreement shall be ruled invalid or unenforceable by any court of competent jurisdiction, the invalidity or unenforceability of such clause, provision or section shall not affect any of the remaining clauses, provisions or sections hereof.

5.9.   *Execution in Counterparts.*   This Broker-Dealer Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

5.10.   *Governing Law; Jurisdiction; Waiver of Trial by Jury.*   This Broker-Dealer Agreement shall be governed by and construed in accordance with the laws of the State of New York (including, without limitation, Section 5-1401 of the New York General Obligations Law or any successor to such statute).   The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York and that, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such court.   EACH OF THE PARTIES HERETO ALSO IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF THIS BROKER-DEALER AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

5.11.   *No Implied Duties.*   Nothing contained in this Broker-Dealer Agreement, the Bond Resolution or the Auction Agreement shall be deemed to imply any duties, covenants or obligations on the part of the Issuer not otherwise expressly set forth herein or therein.

5.12.   *Auction Agreement; Auction Agent Principal Office.*   Pursuant to Section 3.01(a) of Appendix A to the ARS Resolution, BD hereby acknowledges receipt of a copy of the Auction Agreement and a designation by the Auction Agent of the Auction Agent's Principal Office.

[Signature Page Follows]

13

412530.9 027224 AGMT

IN WITNESS WHEREOF, the parties hereto have caused this Broker-Dealer Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date first above written.

DEUTSCHE BANK TRUST COMPANY
AMERICAS,
as Auction Agent

By: _____
     Title:   AVP

CITIGROUP GLOBAL MARKETS INC.

By: _____
     Title:   MD

NORTH CAROLINA EASTERN
MUNICIPAL POWER AGENCY

By: _____
     Chief Financial Officer

[Signature Page of Broker-Dealer Agreement]

**Intentionally Left Blank**